25CA1662 Marriage of Wright 08-13-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1662
El Paso County District Court No. 24DR31583
Honorable Jessica Curtis, Judge

---

In re the Marriage of

Cynthia Ann Wright,

Appellee,

and

Giles Hubert Wright,

Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE MOULTRIE
Grove and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 13, 2026

---

No Appearance for Appellee

The Drexler Law Group, PLLC, M. Addison Freebairn, Colorado Springs, Colorado, for Appellant

¶ 1     Giles Hubert Wright (husband) appeals the district court's permanent orders entered in the dissolution of his marriage to Cynthia Ann Wright (wife).  We affirm.

## I.     Background

¶ 2     The parties were married for over sixteen years, during which time they had two children.  Husband served in the military and financially supported the family, and wife stayed home and took care of the children.  Wife filed a petition for dissolution of marriage in July 2024.  Around the same time, husband moved from Colorado to Kentucky.  And then in March 2025, wife and the children moved from Colorado to Washington.

¶ 3     The court held a permanent orders hearing in May 2025 and, a few weeks later, made oral findings of fact and conclusions of law. The court subsequently entered a written order that incorporated its oral ruling.

¶ 4     Husband appeals the court's division of the marital estate, award of maintenance, and allocation of parental responsibilities (APR).

1

## II. Division of the Marital Estate

### A. Additional Background

¶ 5     When making its findings, the court took into consideration the parties' respective credibility. Specifically, the court found that husband was "combative," "bloviating," and "non-responsive" during cross-examination and that his demeanor during his testimony "significantly impacted his credibility." Noting its concern about husband's credibility, the court found that husband's valuation of personal property accumulated during the marriage was "likely significantly inflated."[1]

¶ 6     The court found wife to be "fairly credible" when she testified that the personal property she took when she moved was "roughly equal" to the property she left for husband in a storage unit and in the marital home. The court thus allocated to each party the personal property that they had in their possession.[2]

¶ 7     Like the personal property, the court allocated to each party the vehicle or vehicles in that party's possession: a BMW for wife

---

[1] Husband estimated the parties' personal property totaled $190,522, while wife estimated $67,260.

[2] The court allocated any personal property in the storage unit and left in the marital home as husband's property.

and an Audi and a Tesla for husband. The court found wife's testimony credible regarding the circumstances of husband's purchase of the Tesla. When it allocated the vehicles, the court noted that husband indicated in his sworn financial statement that the Tesla was "significantly underwater." The court then found that "it appear[ed] that valuation[s] of [Teslas] [were] quite . . . difficult these days," but it believed the value "may . . . start to go up in the future." It found the division of the three vehicles to be fair and equitable.

¶ 8 The court allocated to the parties their individual bank accounts. The court found that the parties had one joint bank account containing only a nominal sum that husband could keep after he closed the account.

¶ 9 Husband had two retirement assets: a Thrift Savings Plan (TSP) account and a military pension. Husband began receiving monthly payments from his military pension in October 2024. The court ordered the TSP account to be divided equally and ordered husband to provide wife with documentation of the TSP account

balance as of the date of the permanent orders hearing and the balance one year before the hearing.[3]

¶ 10    The court found that wife was entitled to half of the marital share of husband's military pension "pursuant to a *Hunt-Gallow*[4] formula" and ordered husband to provide wife with a copy of his DD-214.[5]  The court also ordered husband to pay wife retroactive payments of her portion of these funds dating back to the first payment husband had received.

¶ 11    Lastly, the court divided marital debts.  In considering the parties' debts, the court found that husband hadn't complied with financial disclosure requirements, which "likely mask[ed] expenditures that amount[ed] to dissipation of marital funds."  The

---

[3] Husband's first sworn financial statement from November 2024 listed the value of the TSP account as $41,276.41.  He later valued it at $39,373.29 as of the time of the permanent orders hearing.

[4] The court was referring to two cases: *In re Marriage of Hunt*, 909 P.2d 525 (Colo. 1995) (establishing the methodologies for calculating and distributing the value of the marital portion of military retirement benefits), and *In re Marriage of Gallo*, 752 P.2d 47, 54 (Colo. 1988) (holding that "vested and matured military retirement pay, which has accrued during all or part of a marriage, constitutes marital property subject to equitable division").

[5] A DD-214 is conclusive proof of a person's military service, which includes dates of service.  *See Arthur v. City & County of Denver*, 198 P.3d 1285, 1289 (Colo. App. 2008).

court further found that, because of husband's nondisclosure, it couldn't "know the difference between legitimate marital debt and dissipation." The court thus allocated to each party the debts listed on their sworn financial statements. Wife's listed debts totaled $15,494.48 and husband's totaled approximately $115,000.[6]

### B. Applicable Legal Principles

¶ 12 A district court has great latitude in equitably dividing a marital estate in such proportions as it deems just. *See* § 14-10-113(1), C.R.S. 2025; *In re Marriage of Medeiros*, 2023 COA 42M, ¶ 28. We won't disturb its determination unless we conclude the court abused its discretion. *Medeiros*, ¶ 28. "The key to an equitable distribution is fairness, not mathematical precision." *In re Marriage of Gallo*, 752 P.2d 47, 55 (Colo. 1988).

¶ 13 Before dividing a marital estate, the court must value property as of the date of the hearing on disposition of property. § 14-10-113(5); *see In re Marriage of Wright*, 2020 COA 11, ¶ 4.

---

[6] Husband listed $120,939.75 in total debts on his sworn financial statement, but $4,155.84 of that amount was for a lien associated with the marital home. The court ordered the home to be sold and that debt to be paid from sale proceeds before the parties equally shared the net proceeds, if any.

When a party presents limited evidence on property valuation, the court may base its valuation on that evidence. *See In re Marriage of Eisenhuth*, 976 P.2d 896, 901 (Colo. App. 1999). And when a party presents no evidence on property valuation, the party is precluded from challenging on appeal the sufficiency of the evidence to support the value. *In re Marriage of Zappanti*, 80 P.3d 889, 892 (Colo. App. 2003) ("It is the parties' duty to present the [district] court with the requisite data that would allow it to make a sufficient valuation of [a] retirement [asset], and any failure by the parties in that regard should not provide them with grounds for review.").

## C. Analysis

¶ 14    Husband argues that the court erred when it divided the marital estate because it didn't value the parties' (1) personal property, including vehicles; (2) bank accounts; and (3) retirement accounts. He argues that, because the court didn't value these assets, "it is impossible to review" whether the court's allocation of $100,000 more in debt to him was fair and equitable. He further argues that the court improperly imposed a negative inference against him when it divided the marital estate. We aren't persuaded.

¶ 15    In the parties' respective sworn financial statements, they listed their estimated values for personal property, and husband listed the estimated value for his two vehicles.[7]  Similarly, both parties listed values for each of their individual bank accounts. And husband listed the TSP account's value as $39,373.29 on the date of the permanent orders hearing.

¶ 16    With respect to his military pension, the only information husband presented was a two-page document indicating that his (1) length of service was approximately twenty-three years; (2) gross monthly retirement pay was $4,584; and (3) date of retirement was October 1, 2024.

¶ 17    Although the court didn't make express findings calculating the specific value of every asset, it wasn't required to because the basis for its decision is apparent: the parties' sworn financial statements and testimony.  *See In re Marriage of Sharp*, 823 P.2d 1387, 1389 (Colo. App. 1991) ("Specific findings as to the value of each asset are not required so long as the basis for the [district] court's decision is apparent from its findings.").

---

[7] Wife's sworn financial statement states that the BMW's net value is zero dollars.

¶ 18    We acknowledge that the court didn't calculate the specific value of husband's military pension.  But husband didn't provide the court with enough information for the court to do so.  Because husband didn't provide the court with that information, he can't now challenge the court's findings.  *See Zappanti*, 80 P.3d at 892.  Moreover, husband's assertion that the court allocated 50% of the *entirety* of his military pension misstates the record.  The court ordered that wife would receive 50% of the *marital share* of husband's military retirement.  And, as husband acknowledges, the court in a dissolution proceeding has authority to distribute the marital share of a military pension.  *See Gallo*, 752 P.2d at 54.

¶ 19    Thus, for the foregoing reasons, we discern no abuse of discretion in the court's division of the marital assets.

¶ 20    Husband also challenges the court's debt allocation.  He asserts that the only negative inference that a court can consider during property division is economic fault through dissipation of assets.  He argues that a court cannot, as the court did here, consider a party's failure to disclose income as a basis for concluding that the nondisclosing party dissipated marital assets.  He argues that by doing so, the court erroneously expanded the

holding in *In re Marriage of Sgarlatti*, 801 P.2d 18, 19 (Colo. App. 1990), in which a division of this court concluded that a court may draw a negative inference against a party who refuses to disclose their financial circumstances. And he conclusorily asserts that the negative inference discussed in *Sgarlatti* applies only to a court's determination of a party's income and "cannot simultaneously be applied to a determination of whether a property division is fair and equitable."

¶ 21    We aren't persuaded for two reasons.

¶ 22    First, as husband acknowledges, the court never actually concluded that he dissipated assets despite briefly mentioning its concern that he might have. Nor does it appear that its property division was based on such a conclusion. Under these circumstances, we aren't persuaded that the court's mere mention of its concern about potential dissipation amounts to error.

¶ 23    Second, although the factual circumstances underlying the division's opinion in *Sgarlatti* involved the district court's determination of a party's income, there is nothing in the language of that opinion that limits its application only to a court's income determination. Even if there were such limiting language, we

wouldn't be bound by it. *See Chavez v. Chavez*, 2020 COA 70, ¶ 13. Moreover, "[t]he district court has considerable discretion to impose appropriate sanctions if a party fails to comply with the provisions of C.R.C.P. 16.2," *Wright*, ¶ 27, and drawing a negative inference is an appropriate form of sanction if it appears to the court that a party refused to disclose relevant evidence, *see Aloi v. Union Pac. R.R. Corp.*, 129 P.3d 999, 1004 (Colo. 2006).

¶ 24     Thus, the court didn't err by merely raising its concern about husband's nondisclosure and potential dissipation when allocating the parties' marital debt. Rather, as discussed next, the court allocated husband a disproportionate amount of debt as part of its consideration — and reduction — of wife's maintenance award.

### III.  Maintenance Award

#### A.  Additional Background

¶ 25     The court found that the parties were married for sixteen years and four months, and the guideline term for a maintenance award was ninety-eight months. The court found that wife's monthly income was $4,583 and imputed to husband a monthly income of $12,673, which was his monthly income before he retired from the military. Using those figures, the maintenance guideline amount

was $1,739.55 per month. The court found that, considering the division of marital property, wife "significantly lack[ed] financial resources" to support herself and to meet her reasonable financial needs. The court found that husband had the ability to pay maintenance based, in part, on undisclosed income.

¶ 26 The court further found that the guideline amount of $1,739.55 monthly multiplied by the guideline term of ninety-eight months totaled a lump-sum amount of $170,475.90. And because of the court's disproportionate allocation of debts to husband, the court reduced the term of maintenance from ninety-eight months to thirty-six months, which it found to be fair and equitable.

### B. Applicable Legal Principles

¶ 27 Section 14-10-114(3), C.R.S. 2025, details the process a district court must follow when considering a maintenance request. *See Wright*, ¶ 13. The court must first make findings about (1) the amount of each party's gross income; (2) the marital property distributed to each party; (3) the financial resources of each party; (4) the reasonable financial need established during the marriage; and (5) whether the maintenance award would be deductible for federal income tax purposes. § 14-10-114(3)(a)(I); *see Wright*, ¶ 14.

11

After making these initial findings, the court must determine the amount and term of maintenance, if any, that is fair and equitable to the parties. § 14-10-114(3)(a)(II); *Wright,* ¶ 15.

¶ 28    When determining the amount and duration of maintenance, section 14-10-114(3)(c) requires the court to consider the statutorily enumerated factors as well as any other relevant factors. And the court may adjust the distribution of marital debt in order to reduce the amount or duration of maintenance awarded. § 14-10-114(3)(f).

¶ 29    We review maintenance awards for an abuse of discretion as "the issue of the [parties'] financial resources is factual in nature," but we review de novo whether the district court applied the correct legal standard to its findings of fact. *In re Marriage of Davis*, 252 P.3d 530, 533 (Colo. App. 2011).

## C.    Analysis

¶ 30    Husband contends that the court erred when it (1) made "cursory conclusions" and insufficient findings to support the maintenance award and (2) conducted its maintenance analysis "out of order" because it first determined the maintenance term and then divided the marital debts based on the term. We disagree.

¶ 31    Despite acknowledging that a district court has no obligation to make specific findings on every factor in section 14-10-114(3)(c), *see Wright*, ¶ 20, husband argues that the court "made sweeping generalizations" when it made its findings. But the record demonstrates that the court made express findings with respect to most of the factors appearing in the statute.

¶ 32    Specifically, the court made findings about (1) wife's financial resources and inability to independently meet her needs; (2) husband's financial resources and his ability to pay, which included that he was voluntarily underemployed; (3) the parties' lifestyle during the marriage; (4) the distribution of marital property; (5) both parties' income and employability, which included the parties' disparate education levels — husband had two master's degrees and wife had her GED; (6) the "moderately lengthy" duration of the marriage; (7) the lack of any temporary maintenance paid during the case; (8) the maintenance award not being taxable income for wife and not tax deductible for husband; and (9) husband's domestic violence against and coercive control over wife.

¶ 33    Thus, we reject husband's contention that the court's findings were insufficient and its conclusions were cursory.

¶ 34    Husband next argues that the court conducted its maintenance analysis "out of order" and "justified the property division with the maintenance award." In support, husband relies on *In re Marriage of de Koning*, 2016 CO 2, to assert that a court must follow a specific sequence when making financial decisions in a dissolution proceeding. As relevant here, the court must first divide marital property and then "determine whether maintenance is necessary to provide for the reasonable needs of the party seeking spousal support." *Id.* at ¶¶ 21-22. Nevertheless, section 14-10-114(3)(f) allows the court to adjust the distribution of marital debt and reduce the term of maintenance awarded.

¶ 35    We acknowledge that, in making its oral ruling, the court toggled between making findings regarding its division of the marital estate and its determination of the maintenance award. To the extent the court didn't follow the statutorily prescribed sequence, "this procedure may have been erroneous." *Wright*, ¶ 10, n.1 (citing *de Koning*, ¶ 21). But given that property division and maintenance determinations are "inextricably intertwined," *In re*

*Marriage of Antuna*, 8 P.3d 589, 595 (Colo. App. 2000), we can't conclude that any error was reversible under the circumstances here. Many of the court's findings about the division of property, made after its findings concerning the maintenance award, simply provided additional details for findings it had already made.

¶ 36 Moreover, notwithstanding the sequence in which the court addressed these topics, the court explicitly said it was allocating husband a disproportionate amount of marital debt because it was reducing the term of wife's maintenance award to offset the debt division. Given these findings, the court acted within its discretion under section 14-10-114(3)(f), and we therefore discern no error.

## IV. APR

### A. Additional Background

¶ 37 When the court began its oral ruling, it first made credibility findings as noted in Part II.A above. The court next found by a preponderance of the evidence that husband had committed domestic violence against wife. Then the court made its findings and conclusions regarding the APR, which included that joint decision-making wasn't appropriate. The court thus allocated sole decision-making authority to wife.

15

¶ 38    Regarding wife and the children's move to Washington, the court found that wife violated the automatic temporary injunction that prohibited her from removing the children from the state without husband's consent or a court order.  However, the court concluded that wife moved to Washington in good faith because "[wife] was isolated in Colorado with no support, including zero financial support from [husband], and no means to support herself."  And the court found that the children were well-adjusted to living in Washington with wife.

¶ 39    Concerning the relationship between husband and the children, the court found that the children weren't accustomed to husband's care.  And husband hadn't had contact with the children in about one year.

¶ 40    Both parties submitted a proposed parenting plan for the court to consider.  The court rejected husband's proposed plan and adopted portions of wife's proposed plan.  Because the parties lived in different states, the court ordered specific requirements for the children's travel and transportation between Washington and Kentucky.

B.     Applicable Legal Principles

¶ 41     A court must conduct a "best interests" of the children analysis when it allocates decision-making responsibilities and parenting time. *See* § 14-10-124(1.5), C.R.S. 2025. In doing so, the court must consider the relevant factors identified in section 14-10-124(1.5). *In re Custody of C.J.S.*, 37 P.3d 479, 482 (Colo. App. 2001). If the court finds by a preponderance of the evidence that one of the parents has committed domestic violence and a parent objects to joint decision-making, then it isn't in the children's best interests to allocate joint decision-making unless "mutual decision-making can occur without coercion, intimidation, retaliation, or risk of harm to the abused party or the child[ren]." § 14-10-124(1.5)(c)(I).

¶ 42     While the court isn't required to make express findings on all the statutory factors, its findings must be sufficiently explicit to give an appellate court a clear understanding of the basis of the order. *In re Marriage of Pawelec*, 2024 COA 107, ¶ 44.

¶ 43     A district court has discretion in determining what allocation of parenting time and decision-making responsibilities is in the children's best interests, and we may not disturb its determination

17

absent an abuse of that discretion. *In re Marriage of Badawiyeh*, 2023 COA 4, ¶ 9; *see also In re Marriage of Hatton*, 160 P.3d 326, 335 (Colo. App. 2007) ("When there is record support for the [district] court's findings, its resolution of conflicting evidence is binding on review."). "A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or a misapplication of the law." *Medeiros*, ¶ 28. However, we review de novo whether the district court applied the proper legal standard. *Id.* at ¶ 10.

## C.    Analysis

¶ 44    Husband contends that the court (1) improperly applied negative credibility findings against him; (2) erred when it "ratified" wife's violation of the automatic temporary injunction; and (3) failed to apply and make findings on all the best interests of the children factors. We reject each of his contentions.

¶ 45    First, husband asserts that the court "applied its credibility findings about [his] demeanor during testimony to his value as a [f]ather or his ability to care for the children" and that the court "took its credibility findings too far by using its (perhaps warranted) displeasure with [husband's] live testimony against him when

18

considering the best interests of the children." We aren't persuaded.

¶ 46 The court was required to assess the parties' credibility and to do so in conjunction with considering the applicable APR factors. *See In re Marriage of Laughlin*, 932 P.2d 858, 862 (Colo. App. 1997) (the district court has discretion to assess the credibility of witnesses and the sufficiency and weight of the evidence).

¶ 47 Regarding the court's parenting time determination, one of the factors the court was required to consider was the parties' ability to put the children's needs before their own. *See* § 14-10-124(1.5)(a)(XI). And for decision-making authority, the court was required to consider the parties' ability to cooperate to make joint decisions for the children and whether there was domestic violence. *See* § 14-10-124(1.5)(b)(I), (c)(I). The court found that husband's demeanor corroborated wife's description of him as being overbearing and combative and perceiving everyone "as beneath him." Thus, based on its observations of husband's in-court demeanor, the court credited wife's testimony when she recounted how husband negatively treated her and the children, and in turn used its observations and credibility determinations to

19

inform its APR determination. It was well within the court's province to do so. *See Laughlin*, 932 P.2d at 862.

¶ 48 Second, husband argues that wife "received no consequences for her admitted and unlawful removal of the children," and the court "ratified [wife's] relocation" because it was displeased with husband's disposition at trial. But it doesn't appear that husband ever filed a contempt action against wife as a remedy for her violation of the automatic temporary injunction or a motion requesting temporary parenting time. Thus, any argument related to a lack of "consequences" for wife's removal of the children from Colorado is deemed waived and forecloses our review of that issue. *See In re Estate of Musso*, 932 P.2d 853, 857 (Colo. App. 1997) (failure to make a timely objection with regard to an issue raised on appeal is deemed a waiver and forecloses appellate review of that issue); *see also Avicanna Inc. v. Mewhinney*, 2019 COA 129, ¶ 25 (noting that waiver occurs when a party intentionally relinquishes a known right or privilege).

¶ 49 Furthermore, husband's assertion that the court "ratified" wife's removal of the children because the court was displeased with him is underdeveloped and unsupported by citation to the record or

20

legal authority, so we decline to consider it further. *See In re Marriage of Zander*, 2019 COA 149, ¶ 27 (an appellate court may decline to consider an argument not supported by legal authority or any meaningful legal analysis), *aff'd,* 2021 CO 12.

¶ 50     Third, husband argues that the court's findings were "insufficient to a give a clear understanding of the basis" for its decision-making and parenting time order.

¶ 51     Regarding decision-making, the court acted within its discretion to allocate sole decision-making authority to wife under section 14-10-124(1.5)(c)(I). The court found by a preponderance of the evidence that husband had committed domestic violence against wife, and wife objected to joint decision-making. The court found that husband's position at trial asking the court to order wife to return to Colorado with the children was husband's attempt to exercise control over wife. The court also found that husband exercised "coercive control, particularly financial[] control," over wife throughout the marriage. Thus, the court found there was no credible evidence that the parties could cooperatively make decisions for the children and found that it wasn't possible for joint

decision-making to occur without coercion from husband. *See*
§ 14-10-124(1.5)(b)(I), (c)(I).

¶ 52     Regarding parenting time, the court's findings indicate that it considered the parties' wishes because it rejected husband's proposed parenting time schedule and largely agreed with wife's proposal. The court also considered (1) the children's adjustment to living in Washington; (2) the parties' past pattern of involvement with the children; and (3) the practical considerations of parenting time given the parties' separate domiciles in Washington and Kentucky.

¶ 53     Although husband raises arguments about the court's lack of express findings on other factors, as he acknowledges, the court doesn't have to make specific findings as to every factor. *See Pawelec*, ¶ 44. Thus, the court's findings, which have record support, reflect its consideration of the children's best interests after having considered any conflicting evidence. *See* § 14-10-124(1.5)(a); *see also Hatton*, 160 P.3d at 335 (noting that we will disturb the district court's factual findings only if they lack record support); *In re Marriage of McNamara*, 962 P.2d 330, 333-34 (Colo. App. 1998) (noting that it's the district court's responsibility

22

to judge the credibility of witnesses and resolve conflicting evidence).  Accordingly, we discern no abuse of discretion in the court's APR.

## V.    Disposition

¶ 54    The judgment is affirmed.

JUDGE GROVE and JUDGE GOMEZ concur.